IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JON WALTON, et al.,**             CASE NO. 3:23 CV 625

    Plaintiffs,

    v.                          JUDGE JAMES R. KNEPP II

**AMERICAN NATIONAL RED CROSS, et al.,**

    Defendants.            **MEMORANDUM OPINION AND ORDER**

## INTRODUCTION

Plaintiff Deanna Walton claims that, following her blood donation, Defendant American National Red Cross[1] (the "Red Cross") negligently managed and supervised the blood collection and refreshment area, causing her to pass out and sustain several injuries. Mrs. Walton's husband, Jon Walton (collectively "Plaintiffs"), brings a loss of consortium claim. Before the Court is Defendant's Motion for Summary Judgment (Doc. 17). Plaintiffs opposed (Doc. 18), and Defendant replied (Doc. 19).

For the reasons set forth below, Defendant's motion is granted.

## BACKGROUND

Viewing the facts in the light most favorable to Plaintiffs, the background of this case is as follows:

---

1. Plaintiffs' Complaint names as Defendants American National Red Cross and American Red Cross Ohio Region. (Doc. 1). In its Answer, American National Red Cross stated: "'American Red Cross Northern Ohio Region' is not a proper legal entity. The American National Red Cross is one corporation nationwide; all of its regional and local offices are operating units of the same corporation." (Doc. 8, at 2).

American National Red Cross

The Red Cross operates a nationwide blood bank that collects blood and blood components from volunteer donors to supply blood products to hospitals in the United States. *See* American Red Cross, Blood Supply Statistics, https://www.redcrossblood.org/donate-blood/how-to-donate/how-blood-donations-help/blood-needs-blood-supply.html. The Red Cross must adhere to both the United States Food and Drug Administration ("FDA") guidelines and the Code of Federal Regulations ("CFR"). *See* 21 C.F.R. § 600 *et seq.* The CFR requires Red Cross employees to perform a physical assessment prior to blood donation to ensure donors are in sufficient health to donate blood. 21 C.F.R. § 630.10(d). Such an assessment includes examining: (1) temperature; (2) blood pressure; (3) hemoglobin or hematocrit levels; (4) pulse; (5) weight; and (6) skin. 21 C.F.R. § 630.10(f).

April 2021 Blood Donation

On April 8, 2021, Mrs. Walton donated blood at a drive in Upper Sandusky, Ohio. (Doc. 18-1, at ¶ 2). Upon arrival, Defendant's employee, Cynthia, checked her in. *Id.* at ¶ 4.

During check-in, Cynthia asked Mrs. Walton questions and took her vitals. *Id.* Mrs. Walton informed Cynthia that, after a previous blood donation with Defendant, she became very dizzy and had to lie down. *Id.* at ¶ 5. Additionally, Mrs. Walton told Cynthia she had been advised to inform future Red Cross employees of her history of dizziness and lightheadedness. *Id.*

Following check-in, Cynthia drew Mrs. Walton's blood. *Id.* at ¶ 6. Afterwards, a different Red Cross employee approached Mrs. Walton, finished the collection, and began to handle the blood donation. *Id.* at ¶¶ 6-7. Mrs. Walton told the employee she was not feeling well. *Id.* at ¶ 7. The employee told Mrs. Walton there were refreshments on the table and then walked away,

leaving Mrs. Walton in the blood draw chair unattended. *Id.* at ¶ 8. Mrs. Walton "sat in the donation chair and looked around seeking help[,] but could not see anyone." *Id.* at ¶ 9. She "waited several minutes and realized [her] only option was to try and get some juice." *Id.* She recalls "sliding off the donor chair and taking a few steps", then waking up on the floor on the left side of her body with a throbbing head and painful left shoulder. *Id.* at ¶¶ 10-11. Mrs. Walton realized she had passed out and hit the floor. *Id.* at ¶ 11.

Thereafter, Wyandot County Emergency Medical Services arrived; emergency medical technicians ("EMTs") attempted to get Mrs. Walton's vitals while asking her what happened. *Id.* at ¶ 112. Against EMTs' recommendations, Mrs. Walton refused to be transported to the hospital for further examination. (Doc. 19-1, at 13).[2]

Expert Disclosures

Plaintiffs' expert disclosure deadline was originally April 1, 2024; Defendant's was May 6, 2024. On April 14, 2024, Defendant filed a motion to extend its expert disclosure deadline because Plaintiffs had not yet disclosed their expert witnesses. (Doc. 14). During a telephone status conference held on May 9, 2024, this Court granted Defendant's motion and extended the Defendant's disclosure deadline to June 7, 2024.[3] To date, neither party has disclosed any expert witnesses.

---

2. With its Motion for Summary Judgment, Defendant submitted an Affidavit from counsel, Joyce Edelman, as well as several attached exhibits. *See* Doc. 17-1. Plaintiffs argue Edelman lacks personal knowledge regarding paragraphs two through seven of the affidavit and cannot authenticate the attached exhibits. (Doc. 18, at 3-4). Pursuant Federal Civil Rule 56(e), affidavits in support of a motion for summary judgment must be made based on personal knowledge. In Reply, Defendant provides additional affidavits authenticating the records. *See* Docs. 19, at 3; 19-1 (Coleman Affidavit); 19-2 (Risley Affidavit). In deciding the pending motion, the Court has considered only the properly-authenticated evidence. Moreover, the Court finds these records are not necessary to decide the issues before it.

3. During that phone call, Plaintiffs' counsel stated:

3

On July 3, 2024, Defendant filed the instant Motion for Summary Judgment. (Doc. 17).

### STANDARD OF REVIEW

Summary judgment is appropriate where the Court determines there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). This burden "may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those

---

> I think we are relying on our treating physicians, not necessarily a quote/unquote expert[.] I guess you could consider them experts, that believe the cause of our client's injuries are directly related to the fall, so to speak, at the Red Cross place and so forth, and I think that's how we're proceeding.
>
> We had contacted our client, and we've talked to her multiple times, once this week, having her come in. I think we've kind of - - I think we relayed to defendants that we're trying to get reports - - final reports from the doctors to turn those over, to get them a demand and so forth.

(Doc. 16, at 4).

specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

## DISCUSSION

Defendant moves for summary judgment on two independent grounds. First, Defendant claims it is subject to a professional standard of care, requiring Plaintiffs to produce expert testimony and because Plaintiffs failed to disclose any expert witnesses, they cannot establish the standard of care or breach thereof required to establish a negligence claim. (Doc. 17, at 2). Second, Defendant argues Mrs. Walton's treating physicians cannot provide expert opinions regarding her injuries and damages because they were not identified as experts nor were any expert reports produced by this Court's disclosure deadline. *Id.*

Plaintiffs offer three arguments in opposition: (1) Defendant is subject to an ordinary standard of care, thus expert testimony is not required; (2) the common knowledge exception applies; and (3) Mrs. Walton's treating physicians can provide the necessary causation testimony. (Doc. 18, at 7-9, 13-14).

The Court finds Defendant is subject to a professional standard of care, expert testimony is required to establish it (and breach thereof), and the common knowledge exception does not apply. Because Plaintiffs have provided no such expert testimony, Defendant is entitled to summary judgment. The Court further finds expert testimony is necessary to establish causation, and because Plaintiffs failed to produce the required expert disclosures they also cannot establish the causation element of her negligence claim.

Standard of Care / Breach

Defendant asserts it is subject to a professional standard of care, which requires the testimony of an expert witness. (Doc. 17, at 7). Plaintiffs argue Defendant is subject to an

5

ordinary standard of care and contend that even if a professional standard of care applies, the common knowledge exception applies to negate the requirement of expert testimony. (Doc. 18, at 8).

Under Ohio law, the plaintiff in a negligence action has the burden of establishing the applicable standard of care. *Miller v. Toledo Hosp.*, 2017 WL 1788716, at *5 (Ohio Ct. App.). Expert testimony is generally necessary unless the alleged "lack of skill or care of the professional is so apparent as to be within the comprehension of a layperson." *Simon v. Drake Constr. Co.*, 87 Ohio App. 3d 23, 26 (1993). "This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place[.]" *Bruni v. Tatsumi*, 46 Ohio St. 2d 127, 132 (1976).

Defendant argues courts have consistently held blood donation procedures are not within the comprehension of a layperson, and a professional standard of care applies. (Doc. 17, at 7-8). In *Zaccone v. American Red Cross*, the Red Cross was alleged to have supplied blood infected with Human Immunodeficiency Virus ("HIV") to the plaintiff, and the court held that blood banks are subject to a professional standard of care. 872 F. Supp. 457, 460 (N.D. Ohio 1994). Plaintiffs argue *Zaccone* is distinguishable from the facts of this case because it only referred to the duties of processing and supplying blood, *not* to donor aftercare. (Doc. 18, at 5-7).

While the *Zaccone* court did not specify what the "collection" portion of the blood process encompasses, the Court is reluctant to say it does not include aftercare. The Red Cross has only ever been held to a professional standard of care regardless of the injury or part of the blood donation process during which the injury occurred. *See, e.g.*, *Cruz v. American Nat'l Red Cross*, 2022 WL 2813237, at *3 (10th Cir.) (holding that expert testimony was required to determine the standard of care for a blood draw); *Smith v. Paslode Corporation*, 799 F. Supp.

6

960, 966 (E.D. Mo. 1992), *rev'd on other grounds*, 7 F.3d 116 (8th Cir. 1993) (holding professional standard of care applied because "the uncontradicted evidence . . . show[ed] that nearly every step in the [Red Cross'] collection, processing and distribution of blood requires medical expertise."); *see also LifeSouth Cmty. Blood Ctrs., Inc. v. Fitchner*, 970 So. 2d 379, 383 (Fla. Ct. App. 2007) ("[V]irtually every step of the blood collection process requires the exercise of medical expertise by medical professionals."); *Bradway v. Am. Nat'l Red Cross*, 263 Ga. 19, 21 (Georgia 1993) ("We are convinced that the steps involved in the collection, processing and distribution of blood by the Red Cross constitute a professional medical service."); *Doe v. Am. Red Cross Blood Servs.*, 377 S.E. 2d 323, 326 (S.C. 1989) ("Since the transfusion of blood is characterized as a skilled medical service, then we hold that the Red Cross, as a blood collector and processor, should be treated as professional."). Further, Plaintiffs have pointed to no case law suggesting the Red Cross is subject to anything but a professional standard of care.

Both parties point to the Sixth Circuit case of *Ross v. American Red Cross*, 567 F. App'x 296 (6th Cir. 2014). In *Ross*, a Red Cross employee improperly inserted a needle into the plaintiff's arm, causing significant nerve damage in the form of a medical condition known as complex regional pain syndrome ("CRPS"). *Id.* at 300. The plaintiff in *Ross* failed to present expert testimony to support her negligence claim, and the district court granted the defendant's motion for summary judgment. *Id.* at 310. On appeal, the Sixth Circuit affirmed, reasoning:

> In granting the Red Cross's motion, the district court observed that in a prior order it had "specifically stated … that expert testimony or some type of testimony would be needed to explain the standard of care necessary on an aftercare claim." In the order, the district court explained that "[Ross's] negligent aftercare claim does not allege a claim of ordinary negligence that would be within the knowledge of a lay juror." Rather, Ross "claims that negligent aftercare either caused or exacerbated her condition." The district court stated that "[i]f [Ross] is seeking to link the Red Cross's allegedly negligent aftercare to the onset or worsening of her CRPS/RSD condition, such a theory requires expert testimony to assist the jury, at least with regard to the issue of causation" because

7

> "it takes specialized knowledge to make a valid factual determination of whether certain factors contributed to the onset or exacerbation of a complex medical condition like CRPS/RSD."

*Id.* at 311.

Both parties agree that pursuant to *Ross* (and Ohio negligence law generally), a party is held to a professional standard of care when the alleged negligence is not within the common knowledge of a layperson. Thus, the relevant inquiry is whether aftercare following a blood donation is within the common knowledge of a layperson. The Court finds that it is not.

Defendant argues Plaintiffs failed to produce specific evidence of the Red Cross's duties and breach thereof, and given the complex nature of blood donation such knowledge would not be within the common knowledge of a layperson. *See* Doc. 17, at 9-11. Plaintiffs respond this case is distinguishable from *Ross* because, here, Mrs. Walton's injuries are not complex and are within the comprehension of laypersons. (Doc. 18, at 5-6). But Plaintiffs' argument conflates the issues of duty and causation. It is not the complexity of the injuries that determines the applicable standard of care.

Plaintiffs further argue that, unlike *Ross*, this incident did not require Red Cross employees to make medical decisions during the aftercare process, and blood donation aftercare is commonly known. *Id.* at 6-8. While Plaintiffs argue all laypersons are aware of the "standard waiting period" and "ordinary symptoms" following blood donation, they fail to provide any suggestion as to what these are. *Id.* at 5-6. Absent evidence that such information is known, a layperson would not be able to determine how *long* the standard waiting period is, what is

8

required *during* that waiting period, nor what behaviors constitute "ordinary symptoms." As such, blood donation aftercare is simply not common knowledge.[4]

Plaintiffs' arguments simply beg the question of *what* the standard of care is and demonstrate that it is not within the common knowledge of laypersons. As Defendant points out, Plaintiffs have not identified what, specifically, Defendant was supposed to do in these circumstances. In their brief, Plaintiffs appear to characterize the standard of care as not leaving Mrs. Walton "unattended" or that she should have been "monitored". Were Defendant's employees required to observe Mrs. Walton for a certain period of time? If so, how long? Were they required to sit next to her for that time period or could they observe her from afar? Should they have instructed her to stay seated for a certain period of time or not to stand up? Should they have provided her some specific instruction on what to do if she did not feel well? Would the standard of care involve expecting an individual to verbalize if she needed help or request that someone accompany her to the refreshment table or bring refreshments to her? All of these questions demonstrate that the standard of care here is not one within the common knowledge and understanding of a layperson.

And similarly, Plaintiffs have not presented evidence regarding how this amorphous standard of care was violated: how long Mrs. Walton was left allegedly unattended, whether anyone was observing her from afar, etc. Although she states she "sat in the donation chair and looked around seeking help[,] but could not see anyone" and "waited several minutes and realized [her] only option was to try and get some juice", she does not say she called out for help,

---

4. While Plaintiffs suggest many laypersons have supervised family or friends get blood drawn at the physician's office, the Court agrees with Defendant that blood draws and donations are different procedures due to the vast difference in the volume of blood collected. (Docs. 18, at 5-6; 19, at 5). Thus, the aftercare following a blood donation differs from that of a blood draw and is not applicable to the facts of this case.

9

nor provide any additional information about what Defendant's employees failed to do that she contends they should have. (Doc. 18-1, at ¶ 9). These questions and absent facts demonstrate precisely why expert testimony is required to establish the standard of care and breach thereof, because they are not answerable by a layperson.

Nor does the Court find persuasive Plaintiffs' argument that this case is analogous to a narrow exception of Ohio caselaw applying the common knowledge exception to falls within a medical setting. This line of cases has been described as "a narrow set of cases in which Ohio courts have applied the exception to risks laypeople know about and comprehend the extent of— for example, tripping and falling", *Welch v. United States*, 2025 WL 374248, at *7 (6th Cir.), and "cases dealing with gross inattention during patient care or miscommunication with a patient . . . [including] supervisory negligence and involv[ing] fact patterns in which a patient suffered injury after a medical provider has left the patient unattended[,]" *Cunningham v. Children's Hosp.*, 2005-Ohio-4284, ¶ 21 (Ohio Ct. App.) (citations omitted); *see also Buerger v. Ohio Dep't of Rehab. & Corr.*, 64 Ohio App. 3d 394, 399 (Ohio Ct. App. 1989) ("While no general rule can be stated, those cases [falling within the common knowledge exception] seem to deal with instances of gross inattention to plaintiff's needs when it was obvious that plaintiff needed attention.").

But the instant case is not analogous to cases where the common knowledge exception has been applied—e.g., a restless, sedated, expectant mother who had expressed a desire to climb out of her bed and fell when left unattended (*Jones v. Hawkes Hospital of Mt. Carmel*, 175 Ohio St. 503, 505-07 (Ohio 1964)); a mobility device-bound individual with a history of balance issues left briefly unattended with her walker who fell (*Dimora v. Cleveland Clinic Found.*, 114 Ohio App. 3d 711, 718 (Ohio Ct. App. 1996)); or a patient with multiple sclerosis, impaired

balance, lower limb weakness, and increased spasticity who fell multiple times after being admitted to the hospital (*Taliaferro v. S. Pointe Hosp.*, 2006-Ohio-1611 (Ohio Ct. App.)).

Although these cases involve an individual in a medical setting who suffered a fall, the Court finds them distinguishable from the instant one, and that the standard of care at issue is not so obvious as to fit within the narrow common knowledge exception. The facts presented here do not demonstrate the same "gross inattention" to a known risk as leaving unattended in a hospital a patient with known balance issues, a patient with multiple sclerosis and seizures, or a patient who expressed a desire to climb out of a bed. Rather, Mrs. Walton was seated in a chair following a routine blood donation. The evidence before the Court does not demonstrate that she suffered from any cognitive or speech issues, but, rather, that she determined, not seeing anyone in her immediate vicinity, her "only option" was to get herself some juice.

Because the common knowledge exception does not apply, Plaintiffs are required to establish the standard of care and breach thereof through expert testimony. Plaintiffs did not disclose any expert witnesses by this Court's deadline, and as such, Defendant is entitled to summary judgment on this basis alone.

Loss of Consortium Claim

A claim for loss of consortium is a derivative claim which is dependent upon "the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992). Because loss of consortium is a derivative claim that can only be brought in conjunction with and is dependent upon Mrs. Walton's negligence claim, Mr. Walton's loss of consortium claim fails.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant's Motion for Summary Judgment (Doc. 17) be, and the same hereby is, GRANTED.

    s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: March 5, 2025